715 F.2d 638
 230 U.S.App.D.C. 164
 Eve BARGMANN, M.D., et al., Petitioners,
v.
J. Lynn HELMS, Administrator, Federal Aviation
Administration, Federal Aviation Administration,
Drew Lewis, Secretary of Transportation,
Department of Transportation,
Respondents.
 No. 82-1801.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued March 17, 1983.
Decided Aug. 23, 1983.
 
 Petition for Review of an Order of the Federal Aviation administration.
 Cornish F. Hitchcock, Washington, D.C., with whom Alan B. Morrison, Washington, D.C., was on brief, for petitioners.
 John H. Cassady, III, Atty., F.A.A., Washington, D.C., for respondents.
 Darlene M. Freeman and Vicki L. Sherman, Attys., F.A.A., Washington, D.C., were on brief, for respondents.
 Before WALD and MIKVA, Circuit Judges, and SWYGERT,* Senior Circuit Judge, United States Court of Appeals for the Seventh Circuit.
 Opinion for the Court filed by Circuit Judge MIKVA.
 MIKVA, Circuit Judge:
 
 
 1
 The sole issue presented for review in this case is whether the Federal Aviation Administration (FAA) lacks statutory authority to institute a rulemaking to upgrade the quality of first-aid kits currently carried on board commercial aircraft. Specifically, the FAA contends that it lacks the power, under its mandate to regulate "safety" in the Federal Aviation Act of 1958, to require commercial aircraft to carry medical equipment designed to treat health problems that [230 U.S.App.D.C. 165] "occur" in flight but are not "caused by" flight. We find that the statute portends such power and we reverse. In doing so, however, we emphasize that the FAA need not require such equipment. Our decision today holds merely that the FAA has the statutory authority to proceed with a rulemaking on the subject should it deem such action advisable on the merits.
 
 I. BACKGROUND
 
 2
 The petitioners in this case are forty individual doctors, health care professionals, and airline passengers and two non-profit consumer organizations, Aviation Consumer Action Project (ACAP) and Public Citizen Health Research Group (HRG). In February 1981, several of these petitioners filed a petition for rulemaking with the FAA, requesting the agency to revise its aircraft equipment regulations to require the carriage of additional medical equipment on commercial flights. Currently, the FAA requires air carriers to provide "[a]pproved first-aid kits for treatment of injuries likely to occur in flight or in minor accidents." See 14 C.F.R. § 121.309(d) (1982). In particular, the FAA requires these first-aid kits to include: limited numbers of bandage compresses, antiseptic swabs, ammonia inhalents, and roller bandages; 1/8 of an ounce of burn compound; one (each) arm and leg splint; one roll of adhesive tape; and a pair of scissors. See Appendix A, 14 C.F.R., Part 121 (1982).
 
 
 3
 The gist of the petition for rulemaking was that the contents of these first-aid kits were inadequate to treat the more serious medical problems that airline passengers sometimes develop. To this end, the petitioners cited to articles in professional medical journals and to letters from individual physicians indicating the frequency with which such medical emergencies as heart attacks, allergic reactions, choking, and diabetic comas occur in flight. See, e.g., Petition for Rulemaking at 2-4 & Attachments 1, 3, reprinted in Joint Appendix (JA) 13-15, 18-21, 24. The petitioners also indicated that approximately 75% of long-distance flights have one or more qualified health professionals on board; that over 90% of surveyed physicians report they would volunteer their medical services to passengers who become ill in flight; and that most physicians believe that airlines should be required to carry more sophisticated medical equipment and medications than they now carry. See Petition for Rulemaking at 16 & Attachment 1, reprinted in JA 16, 18-21. Accordingly, the petitioners requested the FAA to consider upgrading domestic air carriers' medical kits toward the more comprehensive kits now used by several international carriers and toward several "model" kits now recommended by medical experts. See Petition for Rulemaking at 4-5 & Attachments 2, 3, reprinted in JA 15-16, 22-28 (referring to "idealized" inflight kit proposed by the Air Transport Medicine Committee of the Aerospace Medical Association; to a list of essential equipment for ambulances developed by the Committee on Trauma of the American College of Surgeons; and to the Doctor's and Medical Service Kits currently used by Scandanavian Air Lines). Although the petition for rulemaking did not endorse any particular list of medical supplies, see JA 15, the contents of the model kits to which the petitioners referred were generally different in kind from the simple bandages, swabs, and splints now required by FAA regulation. The model kits, for example, contain such additional equipment as stethoscopes, oral airways, suction pumps, and oxygen masks and such medications as Adrenalin (to treat cardiac arrest, asthma, and allergic reactions), glucose (to treat diabetic insulin shock), and Donnatal (to treat gastrointestinal difficulties). See JA 22-28.
 
 
 4
 Pursuant to the FAA's rules of practice, a summary of the rulemaking petition was published for public comment in the Federal Register, see 46 Fed.Reg. 42,278 (Aug. 20, 1981). During the subsequent 60-day comment period, the FAA received hundreds of comments, mostly (but not entirely) in support of the proposed rulemaking. On May 19, 1982, however, the FAA denied the rulemaking petition for fear that a revised rule would, if adopted, "require air carriers to [230 U.S.App.D.C. 166] provide equipment and medicine to handle general emergencies not related to flight or shown to affect aviation safety." Denial of Rulemaking at 3, reprinted in JA 69 (emphasis added). According to the agency, such a rule would exceed the FAA's statutory powers, which were alleged to be limited to prescribing only those medical supplies "necessary for the treatment of ... injuries or illnesses likely to be caused or induced by flight." Id. (emphasis added). Although the FAA also expressed its concern that more sophisticated medical kits might be subject to misuse by medically-unqualified persons, see JA 69, the agency made no evaluation of several commenters' suggestions that the kit be kept under lock by the aircraft pilot and released only to properly identified health professionals, see, e.g., JA 37, 43, 44, 49. Indeed, the only acknowledged basis of the FAA's concern, a post-comment-period report of the American Medical Association, recommended that the FAA further study the frequency and type of inflight medical emergencies and "if the study reveals that additional medical equipment or drugs are needed then the FAA develop and promulgate the appropriate regulation to correct this situation," see Delegate's Report, Aviation, Space, and Environmental Medicine 310-11 (Mar. 1982), reprinted in JA 65-66. Perhaps for these reasons, counsel for the FAA repeatedly acknowledged to this court that the FAA's concerns about the potential misuse of medical kits did not form an independent basis for the FAA's denial of the rulemaking petition. See Tape of Oral Argument (Mar. 17, 1983). Accordingly, all of the parties agree that the determinative rationale for the FAA's action, and thus the sole issue presented for judicial review, is the FAA's contention that it lacks the statutory authority to promulgate a rule upgrading the contents of the medical kits carried on board commercial aircraft.
 
 II. REVIEWABILITY AND STANDARD OF REVIEW
 
 5
 At the outset, it is helpful to orient the posture of this case within this circuit's caselaw regarding the reviewability and scope of review of an agency's denial of a petition for rulemaking. In WWHT, Inc. v. FCC, 656 F.2d 807 (D.C.Cir.1981), and Natural Resources Defense Council, Inc. v. SEC (NRDC ), 606 F.2d 1031 (D.C.Cir.1979), respectively, this court held reviewable an agency's decision not to institute rulemaking and an agency's decision, after rulemaking proceedings had been completed, not to promulgate a proposed rule. In both cases, the strong presumption of reviewability under section 10(a) of the Administrative Procedure Act (APA), 5 U.S.C. § 701(a) (1976), was found not to have been offset by a "clear showing" that "pragmatic considerations" made judicial review inappropriate. See WWHT, 656 F.2d at 815 (quoting NRDC, 606 F.2d at 1043). Although both WWHT and NRDC suggest that judicial review might be inappropriate, as a practical matter, in situations where an agency chooses not to regulate for reasons ill-suited to judicial resolution, e.g., because of internal management considerations as to budget and personnel or for reasons made after a weighing of competing policies, see WWHT, 656 F.2d at 817 (quoting NRDC, 606 F.2d at 1046), such pragmatic difficulties are clearly not before us in the present case. Instead, the FAA has denied a petition for rulemaking solely because it believes it lacks the statutory power to act--a rationale that is uniquely well-suited to judicial resolution. Accord National Black Media Coalition v. FCC, 589 F.2d 578 (D.C.Cir.1978) (reviewing FCC decision not to promulgate rule); Action for Children's Television v. FCC, 564 F.2d 458 (D.C.Cir.1977) (same).
 
 
 6
 The appropriate standard of review is found under section 10(e)(2)(A) of the APA, 5 U.S.C. § 706(2)(A) (1976): "the reviewing court shall decide all relevant questions of law, interpret ... statutory provisions, and ... hold unlawful and set aside agency action, findings, and conclusions found to be--(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." As we stated in WWHT, the parameters of this standard will vary with the context of the case. 656 [230 U.S.App.D.C. 167] F.2d at 817. When an agency's decision not to promulgate rules reflects its broad rulemaking discretion, "the agency's determination is essentially a legislative one, and the reviewing court should do no more than assure itself that the agency acted 'in a manner calculated to negate the dangers of arbitrariness and irrationality....' " Id. (quoting Action for Children's Television, 564 F.2d at 472 n. 24). In the present case, of course, we are not presented with such a legislative choice. Rather, we are presented with an agency's refusal to exercise its discretion, based on its belief that it has no power to do otherwise. In this situation, while the agency has the first word on its regulatory jurisdiction, it does not have the last. Cf. Exxon Corp. v. FTC, 665 F.2d 1274 (D.C.Cir.1981) (scope of power delegated to FTC is jurisdictional issue into which court can make independent inquiry under 5 U.S.C. § 706(2)(C)). It is well within the tradition of our review of agency action on petitions for rulemaking to make an independent inquiry into an agency's allegation that it lacks the statutory authority to act. See NAACP v. FPC, 520 F.2d 432 (D.C.Cir.1975), aff'd, 425 U.S. 662, 96 S.Ct. 1806, 48 L.Ed.2d 284 (1976) (holding FPC to be mistaken in concluding that it lacked jurisdiction to promulgate regulations concerning employment discrimination by its regulatees); National Organization for Reform of Marijuana Laws v. Ingersoll, 497 F.2d 654 (D.C.Cir.1974) (remanding peremptory rejection of a petition for rulemaking for a decision by the agency on the merits).
 
 III. SCOPE OF THE FAA'S JURISDICTION
 
 7
 In evaluating the FAA's statutory position, we acknowledge the respect traditionally given an agency's interpretation of the statute it is called upon to enforce. See, e.g., FEC v. Democratic Senatorial Campaign Comm., 454 U.S. 27, 39, 102 S.Ct. 38, 46, 70 L.Ed.2d 23 (1981). But we also are mindful that "the thoroughness, validity, and consistency of any agency's reasoning are factors that bear upon the amount of deference to be given an agency's ruling." Id. at 37, 102 S.Ct. at 45. In the present case, the reasonableness of the FAA's interpretation is undermined on all three counts.
 
 
 8
 To begin, there is virtually no support for the FAA's contention that its present first-aid kit requirement merely reflects a longstanding administrative policy, self-consciously taken "at the outer limits of FAA's authority," to require medical equipment designed only for health problems "induced or caused by" flight but not for those which merely "occur" in flight. See Brief of Respondents at 12, 17. Developed in the 1940's, the first-aid kit rule did not originally put any limits on the contents of the kits; the kits were merely required to be "proper," 6 Fed.Reg. 3,826 (1941), "adequate," 10 Fed.Reg. 8,529 (1945), or "suitable and sufficient," 14 Fed.Reg. 4,307 (1949). Even after the agency began specifying the kits' contents, it stated only that they should contain "at least the items listed herein," and nowhere indicated an "induced or caused by flight" distinction. See 14 Fed.Reg. 7,034 (1949) (emphasis added); 17 Fed.Reg. 2,748 (1952) (same). Although the agency's 1964 rulemaking focused particularly on "injuries likely to occur in flight or in minor accidents," see 29 Fed.Reg. 19,206 (1964), there were no indications that the agency believed itself to be without authority to focus on more general, inflight medical emergencies in the future. This was made evident in 1973 when the FAA revised its first-aid kit rule in light of an agency study of turbulence accidents (which certainly produced "flight-caused" injuries). In response to comments suggesting the broader possibilities of first-aid training for airline crews and the maintenance of medical equipment at airports to evacuate passengers requiring hospitalization (both of which would be of value in all medical emergencies, not only in those "caused by" flight), the FAA stated, "these comments, although outside the scope of the notice concerning this amendment, may be considered in future FAA regulatory action." 38 Fed.Reg. 35,233 (1973) (emphasis added). A similar statement appears in the FAA's 1975 rulemaking: "Comments were also received which recommended the adoption of [230 U.S.App.D.C. 168] requirements for first-aid equipment and crew-member training that are considered outside of the scope of the Notice concerning this amendment. However, those comments may be considered in future FAA regulatory action." 40 Fed.Reg. 1,039 (1975) (emphasis added). In short, we cannot agree with the FAA that the history of its first-aid kit rule has taken place at the "outer limits" of the agency's regulatory authority.
 
 
 9
 Moreover, in light of the broad statutory mandate under which the FAA operates, the agency's present attempt to limit artificially its regulatory authority is unreasonable. The FAA derives its authority to regulate safety from those provisions of the Federal Aviation Act of 1958 (the 1958 Act), 49 U.S.C. §§ 1301-1542 (1976 & Supp. V 1981), which carry forward several of the safety provisions of the Civil Aeronautics Act of 1938 (the 1938 Act), Act of June 23, 1938, ch. 601, 52 Stat. 973 (repealed by 1958 Act). In particular, section 601(a) of the 1958 Act empowers the Administrator:
 
 
 10
 to promote safety of flight in civil aircraft in air commerce by prescribing and revising from time to time:
 
 
 11
 ....
 
 
 12
 (6) such reasonable rules or regulations or minimum standards governing other practices, methods, and procedure, as the Administrator may find necessary to provide adequately for national security and safety in air commerce.
 
 
 13
 49 U.S.C. § 1421(a)(6) (emphasis added). Section 604 of the 1958 Act authorizes the FAA to issue air carrier operating certificates which "shall prescribe such terms, conditions and limitations as are reasonably necessary to assure safety in air transportation." 49 U.S.C. § 1424(b) (emphasis added). And section 313(a) provides the Administrator with the power to issue rules "consistent with the provisions of this Act, as he shall deem necessary to carry out the [Act's] provisions ...." 49 U.S.C. § 1354(a). In its denial of petitioners' request for rulemaking, the FAA did not discuss (or even cite) these provisions. See Denial of Petition, JA 69. On appeal, the agency's counsel acknowledges that the literal terms of the statute are broad but nevertheless urges us to read into them the FAA's narrowing "induced by flight" distinction. See Brief of Respondent at 10-12. We decline to do so. Although we do not interpret the 1958 Act's safety provisions to constitute a general welfare clause, giving the FAA authority over virtually all aspects of life on board commercial aircraft, the proper scope to be given these provisions must comport with the broad language in which Congress couched its delegation of authority. Cf. United Mine Workers of America v. Federal Mine Safety and Health Review Commission, 671 F.2d 615, 626 (D.C.Cir.1982) (rejecting narrow agency interpretation in light of broad safety purposes of 1977 Mine Act). Accordingly, we cannot reconcile the FAA's highly artificial "induced by flight" distinction with the evident intent of Congress to give the FAA "plenary authority to [m]ake and enforce safety regulations governing the design and operation of civil aircraft" in order to insure the "maximum possible safety." See H.R.Rep. No. 2360, 85th Cong., 2d Sess. 2, 7 (1958) (emphasis added), U.S.Code Cong. & Admin.News 1958, p. 3741. The 1938 and 1958 Acts have been construed to embody a "comprehensive scheme for the regulation of the safety aspect of aviation," Pike v. CAB, 303 F.2d 353, 355 (8th Cir.1962) (Blackmun, J.), and we cannot sanction as reasonable, in light of this intended comprehensiveness, an interpretation of the Act which allows the FAA to require bandages and scissors but which withholds from the FAA the authority to require stethoscopes. The Act, by its terms, empowers the Administrator to promulgate regulations reasonably related to safety in flight, see 49 U.S.C. § 1421(a)(6), and we have no doubt that the rule supported by petitioners--regardless of its wisdom as a matter of policy--would at least satisfy this minimum nexus. Not only are inflight medical emergencies of immediate concern to the personal safety of the stricken passengers, see, e.g., Comments of Petitioners, JA 36 (referring to over 100 incidents of serious inflight illnesses), but they may also be of concern [230 U.S.App.D.C. 169] to the safety of others. The record contains numerous examples of airline pilots reacting to inflight medical emergencies by making unscheduled landings, see, e.g., JA 42, 47, 51, 60, 63, as well as indications that the carriage of emergency medical equipment could reduce the necessity of making at least some of these landings, see, e.g., JA 47 (stethoscope on board probably could have enabled passenger-physician to rule out necessity of making emergency landing in Salina, Kansas). The record also indicates that such equipment could be of benefit to stricken pilots or other members of the airline crew. See JA 43. On these bases alone, the FAA's consideration of a rule mandating emergency medical equipment would fit within its authority to regulate "safety" within the meaning of the 1958 Act.
 
 
 14
 Indeed, we find the FAA's contrary view somewhat difficult to square with its position, and with that of the Civil Aeronautics Board (CAB), in a related CAB rulemaking in 1980. In that proceeding, a virtually identical petition for rulemaking was filed with the CAB by several of the same parties who are petitioners in the present case. Although the CAB denied the petition, it did so because it believed the rulemaking should have been properly conducted by the FAA, "which has primary responsibility for safety and health matters.... [And which has] superior expertise and authority to evaluate the adequacy of emergency medical kits." See Order Denying Petition for Rulemaking 2, reprinted in Reply Brief of Petitioners, Appendix A. We find it at least noteworthy that the CAB, which administered the first-aid kit rule prior to the 1958 Act, apparently did not subscribe to the artificial limitations on the FAA's statutory authority now advanced by the FAA itself. We also find it noteworthy that the FAA, which now claims that its lack of statutory authority follows in part from its lack of medical expertise, see Brief of Respondents at 14, offered in 1980 to aid the CAB's consideration of the identical issue with technical assistance from the FAA's Office of Aviation Medicine and Federal Air Surgeon staff, see Letter from FAA Administrator Langhorne Bond to CAB Chairman Marvin Cohen (March 3, 1980), reprinted in Reply Brief of Petitioners, Appendix B. But what we find most unreasonable about the present position of the FAA is that it threatens to leave the merits of the petitioners' request for rulemaking, literally and figuratively, up in the air. Should the FAA's interpretation of the statute be affirmed, petitioners promise to return to the CAB and refile their petition for rulemaking, conjuring up notions of two inflight medical kits: a "flight-induced" kit administered by the FAA and an emergency medical kit administered by the CAB. This is neither good medicine nor good government nor, above all, reasonable statutory interpretation. One of the purposes of the Federal Aviation Act of 1958 was to eliminate just this kind of bureaucratic overlap and fractured administration. See Delta Air Lines, Inc. v. CAB, 543 F.2d 247, 261 (D.C.Cir.1976) (1958 Act made FAA primary federal agency regarding aviation safety). Accordingly, the impractical results of the FAA's statutory interpretation afford a final reason to reject it as unreasonable.
 
 CONCLUSION
 
 15
 We hold today that the FAA enjoys the statutory authority to consider the petitioners' request for rulemaking. According to the FAA's rules of practice, this requires the Administrator to determine, in light of the public comments received, whether the institution of rulemaking proceedings is justified by the reasons put forth in the petition. See 14 C.F.R. § 11.27(d)(f) (1983). In remanding the case to the agency, we express no views whatsoever on the merits of petitioners' request. We hold only that the agency has the power of decision; the decision itself must be made by the FAA.
 
 
 16
 Reversed and Remanded.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. § 294(d)