# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued October 14, 2010       Decided January 21, 2011

No. 09-1233

CITY OF SANTA MONICA,
PETITIONER

v.

FEDERAL AVIATION ADMINISTRATION,
RESPONDENT

———

On Petition for Review of an Order
of the Federal Aviation Administration

———

*W. Eric Pilsk* argued the cause for petitioner. With him on the briefs were *Thomas R. Devine* and *Ivan O. Campbell*.

*Dana Kaersvang*, Attorney, U.S. Department of Justice, argued the cause for respondent. With her on the brief were *Mark B. Stern* and *Alisa B. Klein*, Attorneys, *Paul M. Geier*, Assistant General Counsel for Litigation, U.S. Department of Transportation, and *Paul Samuel Smith*, Senior Trial Attorney.

*Kathleen A. Yodice*, *Frank J. Costello*, and *Jol A. Silversmith* were on the brief for *amici curiae* Aircraft Owners and Pilots Association, et al., in support of respondent.

Before: SENTELLE, *Chief Judge*, HENDERSON and ROGERS, *Circuit Judges*.

Opinion for the Court filed by *Chief Judge* SENTELLE.

SENTELLE, *Chief Judge*: The City of Santa Monica ("Petitioner") petitions this court for review of the Federal Aviation Administration's ("FAA's") final agency decision and order concluding that Petitioner's ordinance banning certain categories of aircraft from operating at the Santa Monica Municipal Airport ("SMO") violates Petitioner's contractual obligations to the federal government. Petitioner claims that it was arbitrary and capricious for the FAA to conclude that Petitioner was failing to make SMO available for use on "fair and reasonable terms and without unjust discrimination, to all types, kinds, and classes of aeronautical use." For the reasons set forth below, we reject Petitioner's contentions and deny the petition for review.

## I.

SMO is a single-runway, regional public airport located in, owned, and operated by Petitioner. SMO has no scheduled passenger service, but serves general aviation aircraft and functions as a reliever airport for the Los Angeles International Airport. SMO serves four categories of general aviation aircraft: Category A and B aircraft (those with approach speeds of less than 121 knots at maximum landing weight) and Category C and D aircraft (those with approach speeds of 121 knots or greater at maximum landing weight). Category C and D aircraft, which make up approximately seven percent of all operations at SMO, are almost exclusively business and executive jets.

In 1981, the Santa Monica City Council enacted a resolution to close SMO, triggering a flurry of litigation between Petitioner, the FAA, and several private parties. In 1984, Petitioner and the FAA resolved their dispute by entering into a contract (the "1984 Agreement"), in which they agreed to the following principles:

(i) The Airport is to be open and available to and for public use as an airport on fair and reasonable terms, without unjust discrimination, and without granting any exclusive rights prohibited by law.

(ii) Pursuant to the Federal Aviation Act of 1958, as amended, exclusive authority is vested in the FAA for the regulation of all aspects of air safety, the management and control of the safe and efficient use of the navigable airspace, and movement of aircraft through that airspace.

Santa Monica Airport Agreement at 2-3 (Jan. 31, 1984) (hereinafter "1984 Agreement"). The parties also agreed that:

(i) The Airport serves an important role in the regional and national system of air transportation and air commerce. It has a vital and critical role in its function as a general aviation reliever for the primary airports in the area. As a reliever facility the Airport attracts and provides services to general aviation thereby diverting aircraft away from the air carrier airports and other heavily used airports in the Greater Los Angeles Area. Study and analysis have confirmed this congestion and that other similar general aviation reliever airports in the area are already heavily used and do not have the ability to

accept or absorb the service provided by Santa Monica Airport.

*Id*. at 3-4. The 1984 Agreement specified that it would remain effective until July 1, 2015, and that Petitioner would operate and maintain SMO "as a viable functioning facility without any derogation of its role as a general aviation reliever" until that date. *Id*. at 9.

Between 1985 and 2003, Petitioner applied for and received $10.2 million in federal funds through grant agreements between Petitioner and the FAA under the FAA's Airport Improvement Program. The 1984 Agreement was incorporated into those grant agreements, which further bound Petitioner to certain grant assurances. Of particular relevance to this case is grant assurance 22, which included the following two restrictions:

(a) [The airport sponsor] will make its airport available as an airport for public use on fair and reasonable terms and without unjust discrimination, to all types, kinds, and classes of aeronautical uses.

\* \* \*

(i) The sponsor may prohibit or limit any given type, kind, or class of aeronautical use of the airport if such action is necessary for the safe operation of the airport or necessary to serve the civil aviation needs of the public.

Grant Agreement, Santa Monica Airport at pt. V, pp. 7-8 (June 27, 1994) (hereinafter "Grant Agreement"). Under the terms of the Airport Improvement Program grants, the agreements between Petitioner and the FAA remain in effect

throughout the useful life of the facilities developed or equipment purchased with the grant funds, but not to exceed twenty years from the date of the acceptance of the funds. *Id.* at pt. V, p. 1. Although the parties dispute whether the grant assurances expire in 2015 or 2023, the parties agree that they currently remain in effect.

In July 2002, the Santa Monica Airport Commission voted to recommend to Petitioner a revised Aircraft Conformance Program that would reserve SMO for the exclusive use of Category A and B aircraft. This action provoked a long series of meetings, discussions and negotiations between Petitioner and the FAA that continued until 2008. On March 25, 2008, Petitioner adopted an ordinance adding section 10.04.06.220 to the City of Santa Monica Municipal Code ("Ordinance"), which prohibits any person from operating a Category C or D aircraft from landing or departing SMO except in emergencies. *See* Santa Monica, Cal., Municipal Code § 10.04.06.220 (2008).

Believing that the Ordinance violated Petitioner's obligations under the grant agreements to make SMO available "for public use on fair and reasonable terms and without unjust discrimination, to all types, kinds, and classes of aeronautical use," Grant Agreement at pt. V, p. 7, the FAA took action to prevent its enforcement. On April 23, 2008, the FAA issued a cease and desist order requiring Petitioner to suspend enforcement of the Ordinance until the FAA issued a final agency decision regarding the Ordinance's legality. The FAA also filed motions with the U.S. District Court for the Central District of California requesting a temporary restraining order and a preliminary injunction to prevent Petitioner from enforcing the Ordinance. The district court granted both motions.

After the district court issued the preliminary injunction, Petitioner and the FAA proceeded through the agency's administrative review process. On May 27, 2008, the FAA issued a director's determination in which it concluded, *inter alia*, that the Ordinance was inconsistent with Petitioner's contractual obligations under the grant agreements. *In the Matter of Compliance with Federal Obligations by the City of Santa Monica, California*, Director's Determination at 66, FAA Docket No. 16-02-08 (May 27, 2008). After the FAA issued the director's determination, Petitioner requested a hearing, which was held before an FAA Hearing Officer in March of 2009. On May 14, 2009, the Hearing Officer issued an initial decision in which he also concluded that that the Ordinance violated grant assurance 22. *In the Matter of Compliance with Federal Obligations by the City of Santa Monica, California*, Initial Decision of the Hearing Officer at 113, FAA Docket No. 16-02-08 (May 14, 2009). After both parties appealed portions of the Hearing Officer's initial decision, the FAA issued a final agency decision and order on July 8, 2009, which concluded that federal law preempts the Ordinance and that the Ordinance violates grant assurance 22. *In the Matter of the City of Santa Monica*, Final Agency Decision and Order at 56, FAA Order No. 2009-1 (July 8, 2009), *modified by* Order Granting Motion for Clarification of Final Agency Decision, FAA Order No. 2009-2 (Sept. 3, 2009) (hereinafter "Final Agency Decision"). Pursuant to 49 U.S.C. § 46110(a), Petitioner seeks review of the FAA's final decision and order.

## II.

In its final agency decision, the FAA concluded that Petitioner's Ordinance was invalid for two reasons: because Congress's grant of exclusive authority to the FAA to regulate aviation safety preempts the Ordinance and because the

Ordinance violates Petitioner's contractual obligations under grant assurance 22. Final Agency Decision at 3-4. Preemption—the basis for the FAA's first conclusion—is a constitutional doctrine, derived from the supremacy clause in Article VI of the Constitution. *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 108 (1992). "Before reaching a constitutional question, a federal court should . . . consider whether there is a nonconstitutional ground for deciding the case, and if there is, dispose of the case on that ground." *Kalka v. Hawk*, 215 F.3d 90, 97 (D.C. Cir. 2000). For this reason, judicial restraint requires us to begin our analysis by examining the FAA's second conclusion regarding Petitioner's contractual obligations.

## A.

Petitioner argues that the FAA acted arbitrarily and capriciously when it concluded that the Ordinance violates grant assurance 22 because the FAA ignored evidence in the record, acted inconsistently with the its own policies and prior decisions, and failed to state a rational connection between the evidence and its conclusion. For the reasons set forth below, we disagree.

This court reviews the "decisions of federal agencies, including the FAA, under the standards set forth by the Administrative Procedure Act." *D&F Afonso Realty Trust v. Garvey*, 216 F.3d 1191, 1194 (D.C. Cir. 2000). The FAA's factual determinations are conclusive if they are supported by substantial evidence. 49 U.S.C. § 46110(c). "We may overturn nonfactual aspects of the FAA's decision only if they are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Boca Airport, Inc. v. F.A.A.*, 389 F.3d 185, 189 (D.C. Cir. 2004) (quoting 5 U.S.C. § 706(2)(A)). "The scope of review under the 'arbitrary and

capricious' standard is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto.*, 463 U.S. 29, 43 (1983) (quotation omitted).

There is no dispute that when Petitioner accepted federal funds under the FAA's Airport Improvement Program, Petitioner agreed to the terms of the grant assurances incorporated into the grant agreements. Nor is there any dispute that grant assurance 22 currently requires Petitioner to make SMO "available as an airport for public use on fair and reasonable terms and without unjust discrimination, to all types, kinds, and classes of aeronautical uses" with the exception that Petitioner may prohibit certain types of aircraft if "such action is necessary for the safe operation of the airport." Grant Assurance at pt. V, pp. 7-8. The parties disagree, however, on whether the Ordinance is unjustly discriminatory and whether it is necessary for safety.

In its final decision, the FAA concluded that "the discriminatory restriction against operators of Categories C and D aircraft is unjust and not necessary for the safe operation of [SMO]." Final Agency Decision at 4. The FAA based this conclusion on four intermediate findings: (1) Category C and D aircraft can operate safely at SMO despite the lack of runway safety areas; (2) Category C and D aircraft are less likely to be involved in an overrun than Category A and B aircraft; (3) in the unlikely event of an overrun by a Category C or D aircraft, it is very unlikely that the aircraft would reach the neighborhoods beyond the SMO runway; and (4) the risks associated with overruns and undershoots at SMO by Category C and D aircraft can be mitigated without

implementing a total ban and without reducing the utility of the runway. *Id.* at 35-46. Under the applicable standard of review, if each of these conclusions was rationally based on facts for which there was substantial evidence in the record, and if together they satisfactorily explain the agency's final determination, then the petition for review must be denied. *See Motor Vehicle Mfrs. Ass'n.*, 463 U.S. at 43 ("[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."); 49 U.S.C. § 46110(c) ("Findings of fact by the Secretary, Under Secretary, or Administrator, if supported by substantial evidence, are conclusive."). First, we consider whether the FAA's four conclusions were rationally based on substantial evidence in the record.

1.

The FAA's first conclusion was a direct rebuttal to Petitioner's primary justification for banning Category C and D aircraft from operating at SMO. Although Petitioner argued that Category C and D aircraft could not safely operate at SMO because the airport lacks "runway safety areas," the FAA disagreed. A runway safety area is a "defined surface surrounding the runway prepared or suitable for reducing the risk of damage to airplanes in the event of an undershoot, overshoot, or excursion from the runway." FAA Advisory Circular No. 150/5300-13 at 3 (Sept. 29, 1989). Current FAA airport design standards call for runway safety areas to extend 300 feet beyond each end of a runway serving Category A and B, Type II aircraft and 1,000 feet beyond each end of a runway serving Category C and D, Type II aircraft. *Id*. at 25, 26-1. In its current configuration, SMO has no runway safety areas extending beyond either end of its single runway and has scant room to add them. The airport, which sits atop a

plateau, is surrounded by residential neighborhoods. Immediately after the SMO runway ends in either direction, a steep incline leads down to public roads and private homes. Petitioner argued that the lack of runway safety areas makes the likelihood of a runway overshoot by a Category C or D aircraft, which have higher landing speeds than Category A and B aircraft, unreasonably high at SMO.

The FAA disagreed, concluding that Category C and D aircraft can operate safely at SMO despite the absence of runway safety areas. The FAA noted that for every landing at SMO, the pilot of the aircraft is required to determine whether his aircraft is capable of landing on SMO's runway, and that the presence or absence of a runway safety area does not factor into the pilot's calculus. Final Agency Decision at 35-36. The FAA also noted that almost half of the Category C and D operations are subject to additional safety precautions either because they are part of fractional ownership programs or because the aircraft are governed by FAA Rule 135, and that other factors—such as improved stopping performance, better trained and more experienced pilots, and more stringent aircraft certification standards—make Category C and D aircraft safer than Category A and B aircraft. *Id.* at 35 & n.53. The FAA also recognized that the 1000-foot runway safety area requirement applies only to new runway construction and that older airports are only required to comply "to the extent possible" considering factors such as feasibility, cost, and impact on operations. *Id*. at 37. The FAA further noted that the runway safety area standards are not operational requirements and that hundreds of airports across the country operate safely without standard runway safety areas, including major airports such as Los Angeles International, Boston Logan, and Midway Chicago. *Id.* Based on these facts, the FAA concluded that Category C and D aircraft could operate safely at SMO in its current configuration.

2.

Next, the FAA considered whether Category C and D aircraft are more or less likely to be involved in an overrun than Category A and B aircraft. The FAA examined evidence pertaining to the frequency of overruns and undershoots and made the following observations. First, that in general, Category C and D aircraft are involved in fewer overruns than Category A and B aircraft. *Id.* at 38. And second, that specifically at SMO, Category A or B aircraft were involved in seven overruns and one undershoot between 1981 and 2008, but Category C and D aircraft were not involved in any overruns or undershoots. *Id.* The FAA also noted that an FAA air safety investigator testified that his office receives reports of Category A and B aircraft overruns daily, but that Category C and D overruns are "incredibly rare." *Id.* at 38-39.

Looking at more general safety information, the FAA noted that National Transportation Safety Board data show that jets (Category C or D aircraft) have an accident rate 8 times lower than single-engine piston aircraft (mostly Category A or B aircraft), 5.75 times lower than twin-engine piston aircraft (mostly Category A or B aircraft), and 4.6 times lower than twin-engine turboprops (mostly Category A or B aircraft). *Id.* at 39. The FAA also credited the testimony of two FAA officials regarding the relative safety of Category C and D aircraft. The manager of the FAA's Part 135 (commuter and on-demand aircraft operations) Air Carrier Operations Branch testified that Category C and D aircraft have a lower probability of suffering the type of defect that would cause a runway excursion or overrun. *Id.* at 40. An FAA air safety investigator testified that Category C and D aircraft are safer than Category A and B aircraft because they have more power, are more technically sophisticated, and

have more highly trained pilots. *Id.* at 38 n.55. Based on this evidence, the FAA concluded that Category C and D aircraft are less likely to be involved in an overrun or an undershoot than Category A and B aircraft. *Id.* at 40.

3.

Although the FAA concluded that an overrun by a Category C or D aircraft would be rare, it acknowledged that an overrun was still possible. To address Petitioner's concerns about the potential damage to private homes located beyond the ends of the SMO runway, the FAA considered how far beyond the runway a Category C or D aircraft could be expected to travel in the event of an overrun. The FAA credited the testimony of Rick Marinelli, the manager of the FAA Airport Engineering Division and a licensed engineer, who stated that an aircraft overrunning the end of SMO's runway would not reach the homes located beyond the runway. *Id.* at 40-41. Marinelli came to this conclusion by modeling the trajectory of an aircraft overrunning the SMO runway at seventy knots—a velocity equal to or above those at which ninety percent of overruns occur. *Id.* Marinelli calculated that the overrunning aircraft would run off the edge of the plateau, travel through the air down the steep incline, and impact the ground on the SMO property, about twenty feet short of the airport's property line. *Id.* at 41. In his calculation, Marinelli modeled the overrunning aircraft's trajectory as a ballistic arc; an action that necessarily includes an assumption that in a seventy-knot overrun situation the aircraft's wings would not be generating any lift. *Id.*

Petitioner attacked Marinelli's testimony as not supported by substantial evidence and questioned several aspects of his calculations. Specifically, Petitioner criticized Marinelli's use of a ballistic trajectory, his assumption that an overshooting

aircraft would exit the runway at seventy knots when ten percent of aircraft overruns occur at higher speeds, and the FAA's failure to enter Marinelli's calculations into the record. To rebut Marinelli's testimony, Petitioner offered the testimony of two witnesses, James Hall, a former chairman of the National Transportation Safety Board, and Robert Trimborn, the acting SMO airport director. *Id*. at 41-42. Hall testified that the Ordinance was reasonable and Trimborn testified that it was possible for an overrunning aircraft to reach the surrounding neighborhoods. *Id*.

The FAA accorded little weight to either Hall or to Trimborn's testimony. The FAA noted that Hall was not even aware of Marinelli's calculations and that he had performed no engineering analysis of his own. *Id*. at 41. Similarly, the FAA observed that Trimborn's testimony was not based upon any engineering studies or scientific calculations. *Id*. at 41-42. Finding Hall's and Trimborn's testimony to be vague, not specific to SMO, and not grounded upon scientific or engineering analysis, the FAA concluded that the preponderance of the substantial evidence supported Marinelli's conclusion that an overrunning aircraft was unlikely to reach the private homes beyond the ends of the SMO runways. *Id*. at 40, 42-44.

4.

Finally, the FAA considered whether there were viable alternatives to banning Category C and D aircraft that would address Petitioner's safety concerns. The FAA focused primarily on the installation of an Engineered Materials Arresting System ("EMAS") at SMO. An EMAS is "a bed of jet-blast resistant cellular cement blocks placed at the end of a runway to decelerate an overrunning aircraft in an emergency . . . that will reliably and predictably crush under

the weight of an aircraft." *Id.* at 13. Citing FAA Advisory Circular 150/5220-22A, *Engineered Materials Arresting Systems*, the FAA noted that "[i]nstallation of an EMAS is an option for enhancing safety when [runway safety area] design standards cannot be met without causing an operational impact at the airport." Final Agency Decision at 13. The FAA also noted that "'[a] standard EMAS provides a level of safety that is generally equivalent to a full [runway safety area] built to the dimensional standards in [FAA Advisory Circular] 150/5300-13, *Airport Design*.'" *Id.* (quoting FAA Advisory Circular 150/5220-22A at ¶ 4).

The FAA Office of Air Safety and Standards has twice proposed solutions to Petitioner that would have used EMAS to stop or substantially slow aircraft that overrun the SMO runway. *Id.* at 45-46. The first solution would have added a 70-knot EMAS to only one end of the runway, the direction used in ninety-five percent of SMO takeoffs and landings. That system would have been capable of stopping a 57,000 pound Gulfstream-IV exiting the runway at 70 knots. *Id.* The second solution would have added shorter 40-knot EMAS systems to both ends of the SMO runway. That system would have been capable of stopping a Gulfstream-IV exiting the runway at 40 knots. *Id.* at 45-46. In addition to adding EMAS, the FAA also noted that Petitioner always retained the option of acquiring the land beyond the SMO runways. *Id.* at 46. Based on the availability of these alternatives, the FAA concluded that the risks associated with overruns and undershoots at SMO by Category C and D aircraft could be mitigated without implementing a total ban and without reducing the utility of the runway. *Id.* at 45.

\*\*\*

As the foregoing review of the FAA's intermediate conclusions demonstrates, each conclusion was rationally based on substantial evidence in the agency record. Although Petitioner disputes some of the FAA's conclusions, there is no evidence that the FAA based its conclusions on irrelevant factors or that the FAA made a clear error in judgment. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. The FAA examined the relevant testimony and data and articulated an explanation that established a rational connection between the facts found and the FAA's decision. Certainly, none of the FAA's conclusions run counter to the evidence before the agency or are "so implausible that [they] could not be ascribed to a difference in view or the product of agency expertise." *Id.*

Having concluded that the FAA's intermediate conclusions were rationally based on substantial evidence in the agency record, the only question that remains is whether those conclusions support the FAA's ultimate conclusion that the Ordinance violates grant assurance 22. As discussed above, grant assurance 22 requires Petitioner to make SMO "available as an airport for public use on fair and reasonable terms and without unjust discrimination, to all types, kinds, and classes of aeronautical uses" with the exception that Petitioner may prohibit certain types of aircraft if "such action is necessary for the safe operation of the airport." Grant Agreement at pt. V, pp. 7-8. The FAA concluded that the Ordinance was both unjustly discriminatory and unnecessary for safety. Final Agency Decision at 4, 34-35, 46.

The Ordinance, which bans all Category C and D aircraft from SMO but permits Category A and B aircraft to continue to operate, is facially discriminatory. Petitioner argues that the FAA failed to consider whether the Ordinance is *unjustly* discriminatory, but this is not the case. The FAA relied on its

first three intermediate conclusions to determine that the Ordinance was unjust. After finding that Category C and D aircraft could operate safely at SMO despite the lack of runway safety areas, the FAA concluded that the Ordinance was unjust because it was unreasonably justified by reference to the FAA's runway-safety-area airport design standards. *Id.* at 33-34. Likewise, after determining that Category A and B aircraft have a greater risk of overrunning or undershooting a runway than Category C or D aircraft, the FAA stated that this contributed to its conclusion that the Ordinance is unjust. *Id.* at 40. Finally, after determining that the possibility of a Category C or D aircraft crashing into the surrounding neighborhoods due to an overshoot was extremely small and after noting that the same concern exists for Category A and B aircraft, the FAA concluded that Petitioner's concern about this type of accident could not reasonably justify the discriminatory ban. *Id.* at 44. These statements articulate a rational explanation for the FAA's conclusion that the Ordinance is unjustly discriminatory that is logically derived from findings supported by substantial evidence in the administrative record. The FAA did not, therefore, act arbitrarily or capriciously when it concluded that the Ordinance was contrary to Petitioner's obligation under grant assurance 22 to make SMO "available as an airport for public use on fair and reasonable terms and without unjust discrimination, to all types, kinds, and classes of aeronautical uses." Grant Agreement at pt. V, p. 7.

The last consideration is whether, despite being unjustly discriminatory, the Ordinance is still consistent with grant assurance 22 because a ban of Category C and D aircraft is "necessary for the safe operation of the airport." *Id.* at pt. V, p. 8. Petitioner and the FAA disagree regarding the proper definition of "necessary," a term which is not defined in the grant assurance. Petitioner argues that necessary, as used in

grant assurance 22, means that any aircraft ban must be "reasonable and justified." Final Brief of Petitioner at 56, *City of Santa Monica v. F.A.A.*, No. 09-1233 (D.C. Cir. Aug. 31, 2010). Even under this definition of "necessary," Petitioner might not prevail, considering that the FAA concluded that the Category C and D ban was unjust and not sufficiently justified. However, whether Petitioner could have prevailed under that definition is not relevant, because the FAA applied a different analysis.

Referring to the possibility of installing EMAS at SMO, the FAA concluded that the "[r]isk associated with overruns and undershoots at SMO by airplanes in Categories C and D can be mitigated—although not eliminated completely—without implementing a total ban and without affecting the utility of the runway." Final Agency Decision at 45. Without expressly defining the term, the FAA's final decision implies that the Ordinance is not necessary because whatever safety benefits the Ordinance might provide can be obtained through alternative measures that will have no impact on the utility of the airport. The FAA's preference for a risk mitigation strategy that has no impact on utility over one that reduces SMO's utility is both logically sound and consistent with the agreements between Petitioner and the FAA. The 1984 Agreement requires Petitioner to operate and maintain SMO "as a viable functioning facility without any derogation of its role as a general aviation reliever." 1984 Agreement at 9. In the same agreement, Petitioner and the FAA also agreed that SMO plays "a vital and critical role in its function as a general aviation reliever" and that "other similar general aviation airports in the area are already heavily used and do not have the ability to accept or absorb the service provided by [SMO]." *Id*. at 3-4.

Applying the Administrative Procedure Act's highly deferential standard of review, *see Int'l Fabricare Inst. v. U.S. E.P.A.*, 972 F.2d 384, 389 (D.C. Cir. 1992) (holding that under the Administrative Procedure Act this court presumes agency action to be valid), we conclude that the FAA did not act arbitrarily or capriciously when it concluded that "the discriminatory restriction against operators of Categories C and D aircraft is unjust and not necessary for the safe operation of [SMO]." Final Agency Decision at 4. The FAA offered reasoned explanations both for its conclusion that the Ordinance is contrary to grant assurance 22's requirement that Petitioner make SMO available "without unjust discrimination, to all types, kinds, and classes of aeronautical uses" and also for its conclusion that the Ordinance was not "necessary for the safe operation of the airport." Although the FAA's final agency decision did not provide an explicit explanation for why the Ordinance was not necessary for safety, the decision as a whole provides the explanation, and we may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974). We agree with the FAA that the Ordinance is inconsistent with Petitioner's obligations under grant assurance 22 and therefore violates the 1994 Grant Agreement.

## B.

Having held that the FAA did not act arbitrarily or capriciously when it concluded that the Ordinance was inconsistent with Petitioner's contractual obligations under grant assurance 22, we decline to consider the preemption issue. "It is the settled practice of the federal courts not to decide constitutional questions where a case may be decided

on other grounds." *Am. Postal Workers Union, AFL-CIO v. U.S. Postal Serv.*, 764 F.2d 858, 861-62 (D.C. Cir. 1985).

## III.

The FAA's final agency decision, which concluded that Petitioner's ban of Category C and D aircraft from SMO was inconsistent with Petitioner's contractual obligations to the federal government to make SMO available for use on "fair and reasonable terms and without unjust discrimination, to all types, kinds, and classes of aeronautical uses," was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. The petition for review is denied.