# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued October 15, 2015        Decided June 10, 2016

No. 13-1222

BRIAN ALLEN WALLAESA,
PETITIONER

v.

FEDERAL AVIATION ADMINISTRATION,
RESPONDENT

On Petition for Review of an Order of
the Federal Aviation Administration

*Adam P. Feinberg*, appointed by the court, argued the cause for petitioner. With him on the brief was *Anthony F. Shelley*, appointed by the court, and *Aiysha S. Hussain*.

*Brian A. Wallaesa*, pro se, was on the brief for petitioner.

*Lewis S. Yelin*, Attorney, U.S. Department of Justice, argued the cause for respondent. With him on the brief were *Benjamin C. Mizer*, Acting Assistant Attorney General, *Vincent H. Cohen*, *Jr.*, Acting U.S. Attorney, *Sharon Swingle*, Attorney, and *John C. Stuart Jr.*, Attorney, Federal Aviation Administration.

Before: BROWN and WILKINS, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* BROWN.

BROWN, *Circuit Judge*: In the catalog of human endeavors, few activities are as fragile as flight. The air offers no mercy for mistakes and no second chances. Flight is, as Winston Churchill observed, "an extremely dangerous, jealous and exacting mistress," demanding unfettered attention and respect. WINSTON S. CHURCHILL, THOUGHTS AND ADVENTURES 128 (Leo Cooper pub., 1990). In that unforgiving environment, otherwise minor disruptions may threaten major damage.

In line with that reality, the Federal Aviation Administration (FAA or Agency), charged with "promot[ing] safe flight of civil aircraft," 49 U.S.C. § 44701(a), has long prohibited conduct aboard commercial flights that interferes with crewmember duties, *see* 14 C.F.R. § 121.580. In the determination now on review, the FAA Administrator assessed a civil penalty against Brian Wallaesa for violating that rule aboard a Southwest Airlines flight in 2009.

Aided by court-appointed amicus curiae, Wallaesa raises multiple challenges to the Administrator's determination. In particular, Wallaesa claims that the FAA lacks authority to proscribe non-violent, disruptive conduct and to initiate civil penalty proceedings against passengers. In view of the FAA's broad statutory authority over aviation safety, and mindful of the precariousness of human flight, we reject those contentions and deny the petition for review.

3

I

A

On November 6, 2009, Wallaesa, a passenger on Southwest Airlines flight 3049 from Baltimore to Las Vegas, struck up a conversation in the boarding line with a female passenger, Jaime T. Once onboard, Jaime sat in the third row aisle seat on the captain's side.[1] Wallaesa joined her, taking the window seat. After another passenger took the middle seat, Wallaesa switched seats with him. Before lifting off, the crew delivered the by-now familiar safety briefing, instructing passengers to keep their seatbelts fastened while the fasten seatbelt sign was illuminated and to follow crewmember instructions. *See* 14 C.F.R. § 121.571 (specifying requirements for pre-flight safety briefings).

What began as innocuous "plane chatter" between Wallaesa and Jaime fast became an annoyance. Amicus Curiae Appendix (A.A.) 143. Wallaesa asked questions, and Jaime "parried with polite attempts to end the conversation." *Id.* at 7. Trying to tune him out, Jaime put on headphones and opened a book. Wallaesa did not take the hint. He tapped her on the shoulder and asked whether she would mind if he put his arm around her. She did mind, telling him "that is weird and uncomfortable," and that she had a boyfriend. *Id.* at 144.

Not long after, Wallaesa again tapped Jaime's shoulder. He wanted to ask a "corny" question. *Id.* at 146. She told him not to ask, reminding him that she had a boyfriend. Wallaesa asked anyway, wanting to know whether he could "hold something beautiful today." *Id.* Jaime told him he

---

[1] The captain's side is the left side, looking toward the front of the aircraft.

crossed the line. She got up and exchanged seats with a passenger across the aisle in the middle seat of row two. She also flagged down a flight attendant, Wendy Moorman, and relayed what happened.

Moorman brought Wallaesa to the back of the plane. She explained that his behavior made Jaime uncomfortable. Wallaesa expressed surprise. He told Moorman that he loved Jaime, "and that she was the one for him." *Id.* at 194. Moorman told him to take his seat and not to talk to Jaime again. Wallaesa complied with the first instruction, returning to his seat. But a few minutes later, he was back up, walking across the aisle to speak to Jaime. Moorman brought him to the back of the plane a second time, again instructing him not to speak to her. Tearful and upset, Wallaesa returned to his seat. Soon, the same pattern repeated itself: Wallaesa left his seat to talk to Jaime, Moorman intercepted him, and brought him to the back. She reiterated her earlier instructions. Wallaesa appeared angry, his eyes wide with agitation. Moorman decided to reseat him, having him switch places with passengers in row eighteen.

About an hour away from Las Vegas, the captain turned on the fasten seatbelt sign in anticipation of turbulence. He likewise instructed the flight attendants to take their seats. Moorman fastened her seatbelt in the front of the aircraft. Another flight attendant, Robert Dumond, took his seat in the back. A short time later, Wallaesa stood up and walked briskly to the front of the aircraft. Unfastening his seat belt, Dumond chased after him. Moorman did the same from the front. They caught up with him around aisle five. Dumond grabbed his arm, telling him he needed to sit down. "I want to talk to her," Wallaesa replied. *Id.* at 246.

Taking him to the front, the flight attendants asked him multiple times to return to his seat, noting that everyone—crew included—had to remain seated with seatbelts fastened. Wallaesa refused each request. Dumond would later explain that the confrontation had become a "security situation." *Id.* at 248. Flight attendants are trained to protect the cockpit, which was only steps away from the ongoing standoff. Those security protocols in mind, Dumond stood with his back to the cockpit door.

Moorman called the captain, who asked whether she needed to summon an FBI Special Agent onboard who had earlier identified himself to the crew. Moorman said she needed the help. She waved to FBI Agent James Mollica, who came forward to assist. Introducing himself as a law enforcement officer, Agent Mollica asked Wallaesa to follow the flight attendant's instructions to return to his seat. Unfazed, Wallaesa refused to go back until he could talk to Jaime.

Agent Mollica upped the ante, telling Wallaesa that he could do this the easy way or the hard way: the hard way, he said, would involve handcuffs. Wallaesa said he did not care: he simply had to speak with Jaime. Having chosen the hard way, Agent Mollica handcuffed him. The flight attendants cleared a row of seats, moving the occupants elsewhere. Meanwhile, Wallaesa began yelling that he loved Jaime, blaming the crew for keeping him from her.

Eventually he stopped yelling. Agent Mollica walked Wallaesa toward the cleared row of seats. But Wallaesa would not sit down, leaning back against Agent Mollica's body. Agent Mollica overpowered him, pushing his body onto the seats. By the time Wallaesa was finally subdued, roughly twenty-five minutes remained until touchdown. Once

on the ground, law enforcement officials met the plane at the gate.

B

The FAA initiated civil penalty proceedings against Wallaesa in February 2010. In a Notice of Proposed Civil Penalty, the Agency sought a $5,500 penalty for interfering with crewmember duties in violation of 14 C.F.R. § 121.580 (Interference Rule). *See* A.A. 33. The charge covered only the last hour of the flight while the fasten seatbelt sign was illuminated.

After Wallaesa requested an informal conference, the FAA realized it had "inadvertently omitted" two other violations: one for failing to fasten a seatbelt while the fasten seatbelt sign was illuminated (14 C.F.R. § 121.317(f)), and the other for failing to follow crewmember instructions to comply with the fasten-seatbelt rule (14 C.F.R. § 121.317(k)).[2] A.A. 35. In April 2010, the FAA added those charges in an Amended Notice of Proposed Civil Penalty, leaving the proposed penalty amount and the factual allegations unchanged. Two months later, in June, the FAA issued a substantively identical Final Notice of Proposed Civil Penalty.

Wallaesa exercised his right to request a hearing. In response, the FAA issued a complaint reiterating the same charges and factual allegations. At a one-day hearing in May 2012, four witnesses testified for the FAA: Jaime (by video deposition), Moorman, Dumond and an FAA aviation safety inspector. Proceeding pro se, Wallaesa testified on his own

---

[2] We will collectively refer to these prohibitions as the Seatbelt Rules.

behalf and called no other witnesses. Wallaesa advanced a theory that a medical emergency—perhaps caused by medications for anxiety and depression—caused his erratic behavior. *See id.* at 309–13.

At the close of the evidence, the Administrative Law Judge (ALJ) determined Wallaesa violated each of the charged regulations. The medical emergency defense was unpersuasive. The ALJ construed that argument as an affirmative defense, which Wallaesa bore the burden of proving. *See id.* at 10; 14 C.F.R. § 13.224(c). By offering no evidence of a medical emergency beyond his own testimony, Wallaesa failed to meet his burden. *See* A.A. 10. The ALJ imposed a penalty of $3,300 for violating the Interference Rule, accepting the FAA's contention that the other violations did not merit a penalty. Wallaesa appealed to the FAA Administrator, who affirmed the ALJ's findings and conclusions.

Wallaesa subsequently filed a petition for review. We have jurisdiction to consider his petition under 49 U.S.C. § 46301(g) and 49 U.S.C. § 46110.[3]

---

[3] After oral argument in this case, Wallaesa filed a petition under Chapter 13 of the Bankruptcy Code. Filing for bankruptcy ordinarily triggers an automatic stay of "the commencement or continuation . . . of a judicial, administrative, or other action or proceeding against the debtor." 11 U.S.C. § 362(a)(1). But Congress excluded certain actions from the automatic stay, including actions by "a governmental unit" intended "to enforce such governmental unit's . . . police and regulatory power." *Id.* § 362(b)(4). Having reviewed supplemental briefing on the issue, we conclude the regulatory power exception applies here. The FAA is a governmental unit, *see* 11 U.S.C. § 101(27) (defining "governmental unit"), and the civil penalty proceeding against Wallaesa enforced the Agency's regulatory powers over matters of

II

The Administrative Procedure Act (APA) governs our review. *See City of Santa Monica v. FAA*, 631 F.3d 550, 554 (D.C. Cir. 2011). Agency findings of fact are conclusive when supported by substantial evidence. 49 U.S.C. § 46110(c). Nonfactual determinations will be overturned "only if they are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.'" *City of Santa Monica*, 631 F.3d at 554 (quoting 5 U.S.C. § 706(2)(A)). By statute, we "may consider an objection to an order of the . . . Administrator only if the objection was made in the proceeding conducted by the . . . Administrator," absent some "reasonable ground for not making the objection." 49 U.S.C. § 46110(d). Before proceeding to the merits, we address the import of this statutory exhaustion requirement.[4]

Wallaesa filed his petition for review pro se. This court appointed counsel as amicus curiae to assist Wallaesa "for the limited purpose of presenting arguments in favor of petitioner's position concerning whether the FAA has authority to impose civil penalties on passengers under 49

---

safety, *see* H.R. Rep. No. 95-595, at 342 (1977) (identifying safety as an object of police and regulatory powers). Therefore, the automatic stay does not apply to the civil penalty assessment or to Wallaesa's petition challenging that determination.

[4] The government's brief did not discuss section 46110(d), relying instead on general principles of exhaustion. *See* Resp. Br. 31 n.7. But the statutory exhaustion requirement "is not 'waived' simply because the [government] fails to invoke it." *EEOC v. FLRA*, 476 U.S. 19, 23 (1986). Section 46110(d), like the exhaustion requirement at issue in *EEOC v. FLRA*, "speaks to courts, not parties, and its plain language evinces an intent that the [FAA] shall pass upon issues arising under the Act, thereby bringing its expertise to bear on the resolution of those issues." *Id.*

U.S.C. § 46301(a)(5)(A)." A.A. 346. Section 46301 provides that "[a]n individual (except an airman serving as an airman) or small business concern is liable to the Government for a civil penalty of not more than $10,000 for violating (i) . . . chapter 447 . . . ; or (ii) a regulation prescribed or order issued under any provision to which clause (i) applies." 49 U.S.C. § 46301(a)(5)(A).

Amicus's brief focuses on the statutory subclauses, noting that the FAA justified the Interference Rule based on its authority under chapter 447. Amicus maintains that chapter 447 does not authorize the regulation of non-violent passenger conduct. Because the Interference Rule proscribes non-violent passenger conduct, so the argument goes, it is *ultra vires*, and the penalty imposed against Wallaesa must be set aside. Section 46110(d) poses no bar to our considering this argument. Before the Administrator and this court, Wallaesa argued that chapter 447 "[a]pplies to requirements of Pilots and Aircraft to Conform to Safety Standards," not to passengers. Resp. App. Br. 8, *FAA v. Wallaesa* (Oct. 26, 2012) (No. CP10WP0010); Pet. Br. 9. That claim sufficiently includes the argument amicus now makes on Wallaesa's behalf.

Amicus raises several other issues, however, that Wallaesa did not present to the Administrator.[5] As a matter of first principles, court-appointed amici enjoy relatively wide latitude to raise arguments not addressed on appeal by pro se parties. *See Bowie v. Maddox*, 642 F.3d 1122, 1135 n.6 (D.C.

---

[5] In particular, amicus contends that the Interference Rule and a set of regulations governing civil penalty proceedings, *see* 14 C.F.R. § 13.14–16, were promulgated without adequate notice and comment. Amicus also argues that Wallaesa's conduct falls outside of the FAA's governing interpretation of the Interference Rule or, if not, that the Interference Rule is impermissibly vague.

Cir. 2011). Indeed, "[i]t is precisely because an untrained pro se party may be unable to identify and articulate the potentially meritorious arguments in his case that we sometimes exercise our discretion to appoint amici." *Id.*

Raising new *arguments* is one thing—raising new *issues* is entirely another. "It is a hard and fast rule of administrative law, rooted in simple fairness, that *issues* not raised before an agency are waived and will not be considered by a court on review." *Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d 1251, 1297 (D.C. Cir. 2004) (emphasis added); *see Nat'l Wildlife Fed'n v. EPA*, 286 F.3d 554, 562 (D.C. Cir. 2002) ("[T]here is a near absolute bar against raising new issues—factual or legal—on appeal in the administrative context."). That principle binds both parties and amici, whether court-appointed or not. It holds special force where, as here, an appeal follows adversarial administrative proceedings in which parties are expected to present issues material to their case. In that setting, "the rationale for requiring issue exhaustion is at its greatest," *Sims v. Apfel*, 530 U.S. 103, 110 (2000), and the appetite of appellate courts to consider new issues at its nadir. Because Wallaesa did not raise these additional issues before the FAA, and no reasonable grounds excused that failure, we decline to address them. *See* 49 U.S.C. § 46110(d).

Having whittled down the field of issues, five remain for our consideration: (1) whether the FAA has authority to prohibit passengers from interfering with crewmember duties, and to impose civil penalties on passengers; (2) whether the FAA unlawfully added charges for violating the Seatbelt Rules; (3) whether substantial evidence supported the finding that Wallaesa violated the charges; (4) whether Wallaesa proved an affirmative defense; and (5) whether the penalty

amount improperly reflected guidance in an FAA order. We address each in turn.

## III

We first consider challenges to the FAA's claim of statutory authority to prohibit passenger interference and to enforce the prohibition with civil penalties. We begin with a brief statutory history of federal aviation regulation.

## A

In 1903, the Wright Flyer leapt into the air and onto the pages of history. In 1926, as commercial and military applications of aviation evolved exponentially, Congress entered the fray, federalizing air traffic rules and authorizing certain regulations related to aviation safety. *See* Air Commerce Act of 1926, ch. 344, 44 Stat. 568. Little more than a decade later, Congress increased federal oversight of aviation safety in the Civil Aeronautics Act of 1938, ch. 601, 52 Stat. 973. The Act created the Civil Aeronautics Authority and charged it with prescribing, "Such reasonable rules and regulations, or minimum standards, governing other practices, methods, and procedure, as the Authority may find necessary to provide adequately for safety in air commerce." Ch. 601, 52 Stat. 973, 1008. Even with these developments, no single agency exercised centralized control over aviation regulation. Instead, a diffuse patchwork of executive branch actors claimed some role in the field. *See* H.R. Rep. No. 85-2360, at 3743–44 (1958).

That splintered arrangement did not last long. In 1958, following a rash of aircraft accidents, Congress "consolidate[d] regulatory authority" in a new agency, the Federal Aviation Administration (FAA). *Sikkelee v.*

*Precision Airmotive Corp.*, No. 14-4193, 2016 WL 1567236, at *1 (3d Cir. Apr. 19, 2016).  Section 601(a)(6) of the Federal Aviation Act of 1958 transferred to the FAA Administrator the authority to make rules "necessary to provide adequately for national security and safety in air commerce."  Pub. L. No. 85-726, 72 Stat. 731, 775.  In 1994, Congress recodified that provision "without substantive change" at 49 U.S.C. § 44701(a)(5).  H.R. Rep. No. 103-180, at 1 (1993).  It provides that the Administrator "shall promote safe flight of civil aircraft in air commerce by prescribing . . . (5) regulations and minimum standards for other practices, methods, and procedure the Administrator finds necessary for safety in air commerce and national security."  49 U.S.C. § 44701(a)(5).

Three years after the passage of the 1958 Act, a string of aircraft hijackings "highlighted" to the FAA the need "to provide additional controls over the conduct of passengers in order to avoid a serious threat to the safety of flights and persons aboard them."  26 Fed. Reg. 7009, 7009 (Aug. 4, 1961).  Relying on section 601 of the 1958 Act, the FAA promulgated a regulation providing that "[n]o person shall assault, threaten, intimidate, or interfere with a crewmember in the performance of his duties aboard an aircraft being operated in air transportation."  *Id.*  That regulation remains in force.  The current version, codified at 14 C.F.R. § 121.580, is substantially the same.[6]

---

[6] The modern version simply replaces the phrase "operated in air transportation" with the phrase "operated under this part."  14 C.F.R. § 121.580.

B

Amicus argues the FAA lacks authority under section 44701(a)(5) to proscribe the non-violent passenger conduct regulated by the Interference Rule. Our prior interpretation of the statute dictates otherwise. In *Bargmann v. Helms*, 715 F.2d 638 (D.C. Cir. 1983), we reviewed the FAA's denial of a rulemaking petition seeking to require upgraded medical kits on commercial aircraft. The FAA had denied the rulemaking petition on grounds that it had no authority to require upgraded kits. *See* 715 F.2d at 639–40. "[I]n light of the broad statutory mandate under which the FAA operates," we found the FAA's "attempt to limit" its power "unreasonable." *Id.* at 642.

We focused on Congress's grant of authority in section 601(a)(6) of the 1958 Act, which authorizes "rules or regulations . . . governing other practices, methods, and procedure, as the Administrator may find necessary to provide adequately for national security and safety in air commerce." Though that language did not "constitute a general welfare clause, giving the FAA authority over virtually all aspects of life on board commercial aircraft," we determined that its "proper scope . . . must comport with the broad language in which Congress couched its delegation of authority." *Id.* That broad language conveyed a clear meaning: "The Act, *by its terms*, empowers the Administrator to promulgate regulations reasonably related to safety in flight." *Id.* (emphasis added).

Legislative history supported that conclusion. The 1958 Act gave "the FAA '*plenary authority* to [m]ake and enforce safety regulations governing the design and operation of civil aircraft' in order to ensure the '*maximum possible* safety.'" *Id.* (quoting H.R. Rep. No. 85-2360, at 3741–42); *see id.*

("The 1938 and 1958 Acts have been construed to embody a 'comprehensive scheme for the regulation of the safety aspect of aviation.'") (quoting *Pike v. CAB*, 303 F.2d 353, 355 (8th Cir. 1962) (Blackmun, J.)). Against that backdrop, we had "no doubt" the FAA had authority to mandate upgraded medical kits. *Id.* Medical equipment satisfied the "minimum nexus" to safety in flight, implicating "the personal safety of the stricken passengers" and crew. *Id.* As a result, we reversed and remanded the FAA's denial of rulemaking authority. *See id.* at 642–43.

The FAA justified the Interference Rule under 49 U.S.C. § 44701(a)(5), the same authority we examined in *Bargmann*. Applying the rubric we set out in *Bargmann*, we agree with the FAA that the Interference Rule reasonably relates to safety in flight.

To begin, preventing passenger interference is no less related to safety in flight than the quality of onboard medical equipment. Without robust medical equipment, the crew could not adequately care for ill passengers. And without a prohibition on interference, the crew could not maintain the "calm, safe and orderly environment" vital to commercial air travel. *See* A.A. 30.

To put this predicament in perspective, consider the following reported incidents of passenger misbehavior, which include

> a passenger urinating on another passenger; an investment banker defecating on a food cart in response to not being served another glass of wine; . . . a passenger grabbing a flight attendant's neck after being told to put his cigarette out; an enraged passenger attempting to enter the cockpit after being told he was whistling too

loudly; a passenger disrobing and proceeding to destroy the lavatory and fight with another passenger; and four members of a flight crew being physically assaulted by a passenger after the passenger had been refused a sandwich.

Tory A. Weigand, *Air Rage and Legal Pitfalls for State-Based Claims Challenging Airline Regulation of Passenger Conduct During Flight*, Boston B.J., May–June 2001, at 10. As those examples colorfully suggest, passenger interference bears a nexus to flight safety. Disruptive behavior sows distraction and chaos in an environment where law and order is paramount, potentially preventing the crew from executing emergency procedures or reaching passengers in need. *See, e.g.*, *Evgeniy V. Ignatov*, FAA Order No. 96-6, 1996 WL 210098, at *2 (Feb. 13, 1996) (observing "that flight attendants are responsible for" passenger safety and that "passengers must follow the directions given by flight attendants, because law and order in an enclosed capsule at 30,000 feet must be maintained"); *United States v. Hicks*, 980 F.2d 963, 972 (5th Cir. 1992) ("The potential for disaster being so great, even the more mundane duties of flight attendants which implicate safety cannot be taken for granted.").

Disruptive behavior need not be violent to interfere with crewmember duties. To offer only two potential examples, imagine a seated passenger loudly played a portable boombox and refused to wear headphones, forcing crewmembers to intervene.[7] Alternatively, imagine that a passenger blocked

---

[7] This hypothetical actually happened. In 1991, several passengers on a flight from Montego Bay, Jamaica to Houston, Texas blasted a boombox radio, and indignantly refused multiple requests from flight attendants to wear headphones or turn it off. *Hicks*, 980 F.2d at 965–68. In language representative of the incident, one of the

the aisle, obstinately declining requests to move. Both examples could theoretically constitute interference and jeopardize flight safety, even though neither one involved violence or the threat of violence (and, in the first example, the offending passenger never left his seat).

It comes as no surprise, then, that the FAA has assessed penalties for non-violent but disruptive passenger behavior. In one case, a passenger refused to fasten his seatbelt, loudly bickered with a flight attendant, and refused to return the attendant's security badge after she let him review it. *See David G. Stout*, FAA Order No. 98-12, 1998 WL 348025, at *1–4 (June 11, 1998). In another, a passenger angrily rejected requests to turn off his personal electronic device and verbally abused a flight attendant. *See Hillard Abroms*, FAA Order No. 2008-2, 2008 WL 345387, at *1–3, *5–6 (Jan. 28, 2008).

These examples highlight a basic reality: without some means of controlling disruptive passenger behavior, the FAA could not hope to promote—much less to provide for—the safety of passengers "encased in a metal capsule hurtling through the air." *Ignatov*, 1996 WL 210098, at *2. Promoting aviation safety is the touchstone of the 1958 Act, and the FAA's surpassing responsibility. That mandate runs throughout the Act from top to bottom. Congress commanded that safety and security would hold "the highest priorities in air commerce." 49 U.S.C. § 40101(d)(1). And when

---

passengers told an attendant "to get her 'ass[] back there and do [her] job to get them something to eat and drink.'" *Id.* at 966. None of the misbehaving passengers "committed assault or battery or verbally threatened" anyone. *Id.* at 968. Even so, the Fifth Circuit upheld their criminal convictions for interfering with crewmember duties by way of intimidation. *See id.* at 975. The court had no difficulty concluding that the outrageous—but non-violent—behavior interfered with crewmember duties. *See id.*

prescribing regulations under section 44701, the Administrator must first consider "the duty of an air carrier to provide service with the highest possible degree of safety in the public interest." *Id.* § 44701(d)(1)(A). By prohibiting behavior that puts at risk the safety of flight, the FAA has satisfied our inquiry in *Bargmann* and acted within the bounds of its statutory mandate.

Amicus lodges three counterarguments, none of which have purchase. The first claims that non-violent passenger behavior does not constitute a practice, method, or procedure under section 44701(a)(5). That is a red herring. A prohibition on such conduct may itself be a practice, method, or procedure. Taking that view does not open the provision to abuse. *Bargmann* requires that rules promulgated pursuant to section 44701(a)(5) relate to safety in flight. Consider a rule requiring crewmembers to wear socks of a certain color. That mandate may well qualify as a "practice," but the FAA may have difficulty justifying it as related to safety in flight.

Amicus next employs the *ejusdem generis* canon to argue that section 44701(a)(5) must bear a meaning similar to the four subparts that precede it. That canon "limits general terms which follow specific ones to matters similar to those specified." *Gooch v. United States*, 297 U.S. 124, 128 (1936). Amicus suggests the preceding subparts in section 44701 relate solely to matters "involving the physical aircraft or air carrier personnel." Amicus Br. 20. According to amicus, the fifth subpart, concerning practices and procedures "the Administrator finds necessary for safety," cannot reach the separate matter of passenger conduct.

We disagree. First, the *ejusdem generis* "canon does not control . . . when the whole context dictates a different conclusion." *Norfolk & W. Ry. Co. v. Am. Train Dispatchers*

*Ass'n*, 499 U.S. 117, 129 (1991). That rule of thumb applies here. As we held in *Bargmann*, section 44701's broad language conveys broad authority. The subpart at issue, (a)(5), provides authority to make rules reasonably related to flight safety. It will not tolerate the narrower ambit amicus seeks to impose. Second, *even if* the canon applied, the Interference Rule would fall within the parameters amicus suggests. As the earlier analysis reveals, passenger interference necessarily involves the safety of the "physical aircraft or air carrier personnel."

In the third counterargument, amicus contends that Congress implicitly barred the FAA from outlawing passenger misbehavior when it enacted a statute criminalizing limited forms of interference, 49 U.S.C. § 46504. Section 46504 applies to "[a]n individual . . . who, by assaulting or intimidating a flight crew member or flight attendant of the aircraft, interferes with the performance of the duties of the member or attendant or lessens the ability of the member or attendant to perform those duties." 49 U.S.C. § 46504.

We refuse to the draw the strained inference proposed by amicus. Section 46504 pertains only to interference by way of assault or intimidation, a much narrower slice of conduct than the Interference Rule's comprehensive prohibition on interference with crewmember duties. We fail to see how Congress, in carving out as criminal a small universe of conduct, forbade *sub silentio* the FAA from proscribing less serious conduct that is nevertheless detrimental to safety in flight. *Cf. Tex. Rural Legal Aid, Inc. v. Legal Servs. Corp.*, 940 F.2d 685, 694 (D.C. Cir. 1991) ("[A] congressional prohibition of particular conduct may actually *support* the view that the administrative entity can exercise its authority to eliminate a similar danger.").

In sum, "we have no doubt" that proscribing passenger interference with crewmember duties satisfies the "minimum nexus" to safety in flight required by *Bargmann*. *See* 715 F.2d at 642. We therefore reject amicus's argument.

C

Wallaesa next argues that the FAA lacks authority to impose civil penalties on passengers. The relevant statute reads as follows:

(A) An individual (except an airman serving as an airman) or small business concern is liable to the Government for a civil penalty of not more than $10,000 for violating—

(i) . . . chapter 447 (except sections 44717-44723); or

(ii) a regulation prescribed or order issued under any provision to which clause (i) of this paragraph applies.

49 U.S.C. § 46301(a)(5)(A).

Because statutory text is the ultimate measuring stick of statutory meaning, we start there. Section 46301 applies to "individual[s]," a term the statute does not define. When Congress leaves a term undefined, "we look first to the word's ordinary meaning." *Mohamad v. Palestinian Auth.*, 132 S. Ct. 1702, 1706 (2012). For that task, we have some help. The Supreme Court recently considered the meaning of "individual" in the Torture Victim Protection Act (TVPA), which also left the word undefined. *See id.* The Court turned first to dictionaries. "As a noun, 'individual' ordinarily means '[a] human being, a person.'" *Id.* at 1707 (quoting 7 OXFORD ENGLISH DICTIONARY 880 (2d ed. 1989)); *see also, e.g.*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY

1152 (1986) ("a particular person"); BLACK'S LAW DICTIONARY (10th ed. 2014) ("a single person or thing").

Everyday parlance confirmed that common sense understanding. "We say 'the individual went to the store,' 'the individual left the room,' and 'the individual took the car,' each time referring unmistakably to a natural person." *Mohamad*, 132 S. Ct. at 1707. While Congress "remains free, as always, to give the word a broader or different meaning," "there must be *some* indication Congress intended such a result." *Id.* In the TVPA, the Court found no such contrary indication.

A similar analysis applies here. Left undefined, the term "individual" in section 46301 carries its ordinary meaning, referring to a natural person. Very plainly, an airline passenger is a natural person not serving as an airman.[8] *See* 49 U.S.C. § 46301(a)(5)(A). No evidence supports a broader or different meaning.

If anything, statutory context reinforces our reading. In section 46301(d)(5)(B), Congress provided special privileges for some, but not all, "individuals." Specifically, "[a]n individual acting as a pilot, flight engineer, mechanic, or repairman may appeal" a civil penalty order to the National Transportation Safety Board (NTSB). 49 U.S.C. § 46301(d)(5)(B). Individuals *not* acting in those positions—all other natural persons—have no right to appeal to the NTSB. Wallaesa is therefore mistaken to suggest the term individual includes only "operators of the service." *See* Pet.

---

[8] Congress defined "airman" to mean, among other things, "an individual . . . in command, or as pilot, mechanic, or member of the crew, who navigates aircraft when under way." 49 U.S.C. § 40102(a)(8)(A).

Br. 10. If Congress had intended that narrow meaning, it knew how to say so. *Cf. Conn. Nat. Bank v. Germain*, 503 U.S. 249, 253–54 (1992) ("[A] legislature says in a statute what it means and means in a statute what it says.").

It is true that Congress sometimes refers to passenger conduct directly. In language familiar to anyone who has flown, section 46301(b)(1) provides that "[a] passenger may not tamper with, disable, or destroy a smoke alarm device located in a lavatory on an aircraft providing air transportation." 49 U.S.C. § 46301(b)(1). While the prohibition in (b)(1) speaks to passengers, the penalty provision in (b)(2) instead addresses individuals: "An *individual* violating this subsection is liable . . . for a civil penalty of not more than $2,000." *Id.* § 46301(b)(2) (emphasis added). This juxtaposition must mean that the term individual includes passengers. Were it otherwise, the penalty provision would have no effect, authorizing fines against a class of persons not subject to the prohibition.

We conclude that the ordinary meaning of "individual" applies, and that passengers naturally fall within that understanding. Any discussion of "legislative history is unnecessary in light of the statute's unambiguous language." *Mohamad*, 132 S. Ct. at 1709.

## IV

In this section, we consider four challenges to decisions made by the ALJ and the Administrator. We reject each one.

## A

The FAA originally charged Wallaesa with violating the Interference Rule. When Wallaesa requested an informal

conference, the Agency realized it had omitted violations of the Seatbelt Rules, and added them in an amended notice. The factual allegations and proposed penalty amount remained the same. Wallaesa alleges the Agency improperly added the new violations. As did the government, we read Wallaesa's challenge to suggest he received inadequate notice.

That argument fails. "The Due Process Clause and the APA require that an agency setting a matter for hearing provide parties with adequate notice of the issues that would be considered, and ultimately resolved, at that hearing." *Pub. Serv. Comm'n of Ky. v. FERC*, 397 F.3d 1004, 1012 (D.C. Cir. 2005) (Roberts, J.); *see* 5 U.S.C. § 554(b)(3) ("Persons entitled to notice of an agency hearing shall be timely informed of . . . the matters of fact and law asserted."). Wallaesa received three separate notifications of the additional charges: an Amended Notice of Proposed Civil Penalty, a Final Notice of Proposed Civil Penalty, and a formal Complaint. The Complaint issued in July 2010—nearly two years before Wallaesa's administrative hearing in May 2012. On these facts, Wallaesa had more than adequate notice. Neither the Due Process Clause nor the APA requires anything more.

B

The final cluster of challenges centers on the Administrator's determination that Wallaesa violated the Interference Rule and the Seatbelt Rules. That determination stands if supported by substantial evidence, "mean[ing] such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).

Substantial evidence supported the finding that Wallaesa violated the Seatbelt Rules. Multiple eyewitnesses testified that Wallaesa left his seat after the captain activated the fasten seatbelt sign, strode toward the front of the aircraft, and refused multiple requests to return to his seat. The Administrator appropriately found that conduct in violation of 14 C.F.R. § 121.317(f), which requires passengers to remain seated while the fasten seatbelt sign is activated, and 14 C.F.R. § 121.317(k), which requires passengers to follow crewmember instructions concerning compliance with the seatbelt sign.

Substantial evidence likewise supported the finding concerning the Interference Rule, 14 C.F.R. § 121.580. As the Administrator concluded, the flight attendants were obligated "to obey the instructions of the pilot" to remain seated and "to maintain a calm, safe and orderly environment." A.A. 30. Wallaesa directly interfered with those duties. By marching to the front of the aircraft and repeatedly ignoring crew instructions, Wallaesa effectively forced the crew to stand during a potentially turbulent descent in violation of the captain's command to remain seated. And he disrupted the crew's ability to provide a safe and orderly environment, triggering a standoff ended only by the intervention of law enforcement. In short, adequate evidence supported the finding that Wallaesa violated the Interference Rule.

Wallaesa raises two final issues. In the first, he challenges the Administrator's finding that he failed to prove an affirmative defense. We find no reason to disturb that determination. Wallaesa bore the burden to prove his affirmative defense, *see* 14 C.F.R. § 13.224(c), but failed to introduce any evidence beyond his self-serving, uncorroborated testimony.

24

Finally, Wallaesa contends that the amount of his civil penalty improperly reflected the FAA's guidance on administrative penalties contained in FAA Order No. 2150.3B. According to Wallaesa, that order "has no basis in U.S. code" and is not mentioned in the Agency's civil penalty regulations. Pet. Br. 8. Wallaesa misses the mark. FAA Order 2150.3B simply articulates "the general policy the FAA intends to apply in selecting the types of sanctions . . . and specific sanction amounts to impose in legal enforcement actions for typical violations of the FAA's statute and regulations." FEDERAL AVIATION ADMINISTRATION, ORDER NO. 2150.3B, FAA COMPLIANCE AND ENFORCEMENT PROGRAM 7-1 (2007). In this case, the ALJ set a penalty amount "based upon his analysis of sanctions imposed in past cases involving similar violations," not on the general guidance contained in FAA Order No. 2150.3B. A.A. 26; *see also id.* at 27 (noting that the $3,300 penalty imposed "was below the recommended range" of $4,400 to $11,000). We reject Wallaesa's challenge.

V

Finding no merit in Wallaesa's challenges, we deny the petition for review.

*So ordered.*