# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued February 14, 2019         Decided April 23, 2019

No. 18-1157

AIR TRANSPORT ASSOCIATION OF AMERICA, INC., D/B/A
AIRLINES FOR AMERICA,
PETITIONER

v.

FEDERAL AVIATION ADMINISTRATION,
RESPONDENT

PORT OF PORTLAND,
INTERVENOR

———

On Petition for Review of a Final Agency Decision
of the Federal Aviation Administration

———

*M. Roy Goldberg* argued the cause and filed the briefs for petitioner. *David A. Berg* entered an appearance.

*Caroline D. Lopez*, Attorney, U.S. Department of Justice, argued the cause for respondent. With her on the brief were *Alisa B. Klein*, Attorney, and *Charles E. Enloe*, Trial Attorney, U.S. Department of Transportation.

*Pablo O. Nuesch*, *Peter J. Hopkins*, and *Ian Whitlock* were on the brief for intervenor Port of Portland, Oregon in support of respondent.

*W. Eric Pilsk* and *Thomas R. Devine* were on the brief for *amicus curiae* Airports Council International - North America in support of respondent. *Nicholas A. DiMascio* entered an appearance.

Before: ROGERS and TATEL, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: Air Transport Association of America, Inc., an association of airlines with members that use the Portland International Airport, petitions for review of the decision of the Federal Aviation Administration ("FAA") that payments of the Airport's utility charges for off-site stormwater drainage and Superfund remediation did not constitute the impermissible diversion of airport revenues or violate the Anti-Head Tax Act. The Association contends that the decision is based on erroneous statutory interpretations, its findings are not supported by substantial evidence, and it is arbitrary and capricious. We deny the petition. Congress expressly authorized the use of airport revenues for "operating costs . . . of the airport" and the FAA has properly determined that the general expenses of a utility are such "operating costs."

**I.**

Airports receiving federal grants for airport development projects are subject to grant assurances, 49 U.S.C. § 47107(a). Congress directed the FAA to establish policies and procedures to enforce the grant assurances and to prohibit unauthorized

diversion of airport revenues. *Id.* § 47107(k). Specifically, Congress instructed in subsection (k)(2) that:

> Policies and procedures to be established pursuant to paragraph (1) of this subsection shall prohibit, at a minimum, the diversion of airport revenues (*except as authorized under subsection (b) of this section*) through--
> **(A)** direct payments or indirect payments, other than payments reflecting the value of services and facilities provided to the airport;
> **(B)** use of airport revenues for general economic development, marketing, and promotional activities unrelated to airports or airport systems;
> **(C)** payments in lieu of taxes or other assessments that exceed the value of services provided; or
> **(D)** payments to compensate nonsponsoring governmental bodies for lost tax revenues exceeding stated tax rates.

*Id.* § 47107(k)(2) (emphasis added). Subsection (b) referenced in the parenthetical provides:

> (1) The Secretary of Transportation may approve a project grant application under this subchapter for an airport development project only if the Secretary receives written assurances, satisfactory to the Secretary, that local taxes on aviation fuel (except taxes in effect on December 30, 1987) and the revenues generated by a public airport will be expended for the capital or *operating costs* of--
> **(A)** *the airport*;
> **(B)** the local airport system; or
> **(C)** other local facilities owned or operated by the airport owner or operator and directly and substantially

> related to the air transportation of passengers or property.

*Id.* § 47107(b) (emphases added). The same restrictions on revenue use are imposed on any "airport that is the subject of Federal assistance" under 49 U.S.C. § 47133(a), which tracks the text of section 47107 in relevant respects. Pursuant to section 47107(k), the FAA has issued guidance, including the *Policy and Procedures Concerning the Use of Airport Revenue*, 64 Fed. Reg. 7,696 (Feb. 16, 1999) ("Revenue Use Policy") and the FAA Airport Compliance Manual, FAA Order No. 5190.6B (Sept. 30, 2009) ("Compliance Manual").

Portland International Airport is located in the City of Portland, Oregon. It is a federally-funded, public airport that is owned and operated by the Port of Portland. The Port is subject to the grant assurances required under section 47107, including that airport revenues must be spent on capital or operating costs of the airport. The City independently operates water, sewer, and stormwater utilities for ratepayers within city limits, including the Port. The Port pays a combined sewer/stormwater/water bill with multiple line items, including charges for "Stormwater Off-site Drainage" and the "Portland Harbor Superfund." The Port pays for its combined utility costs using airport revenue.

On February 10, 2016, the Association filed a complaint with the FAA alleging that the Port's payment of the off-site stormwater and Superfund charges constitutes unlawful airport revenue diversion under 49 U.S.C. § 47107(b), § 47133, and Grant Assurance 25 because the charges did not directly benefit the Airport. It also alleged these charges violate the Anti-Head Tax Act, 49 U.S.C. § 40116. The off-site stormwater charge covers the costs of managing stormwater discharge from the City's streets and other property. The City calculates this

charge uniformly for all ratepayers based on the amount of impervious surface area on the ratepayer's property. The Superfund charge relates to the City's liability as a potentially responsible party for hazardous-substance contamination in the Willamette River, which runs through downtown Portland. The City charges all ratepayers for the Superfund charge, calculating the charge based on a sanitary-sewer charge and the square footage of impervious surface area on the ratepayer's property.

The Director of the Office of Airport Compliance and Management Analysis found no merit to the Association's complaint. Director's Determination, *Air Transport Ass'n of America v. Port of Portland, Oregon*, FAA Docket No. 16-16-04 ("*Determination*"). Observing that "[i]t has long been established that an airport sponsor may use airport revenues to pay costs directly related to the operation of an airport," the Director pointed to the Revenue Use Policy, which "provides that '[o]perating costs for an airport may be both direct and indirect and may include all expenses and costs that are recognized under the generally accepted accounting principles and practices that apply to the airport enterprise funds of state and local government entities.'" *Id.* at 12 (quoting Revenue Use Policy, 64 Fed. Reg. at 7,718). The Director also pointed to the Compliance Manual, which defines operating costs to include utility costs, and to the definition of utility costs in the Federal Accounting Standard Advisory Board Handbook of Federal Accounting Standards and Other Pronouncements (June 30, 2015). *Id.* While "capital or operating costs" are not defined in the statutes or the Revenue Use Policy, the Director explained that "the plain meaning of the terms requires that the costs be related to the operations or capital requirements of the airport system" and found the two challenged charges are "also within the scope of the Airport's operating costs under the FAA Revenue Use Policy." *Id.* at 12–13. Consistent with guidance

in the Revenue Use Policy, the Director concluded the two charges are properly classified as operating costs of the Airport because they are uniformly assessed by the City in a non-discriminatory fashion and are based on a common cost allocation method. *See* Revenue Use Policy, 64 Fed. Reg. at 7,719. The Director found no merit to the Association's Anti-Head Tax objection, finding that the City has not levied or collected a charge on the gross receipts derived from air commerce or transportation contrary to the Anti-Head Tax Act.

The Acting Associate Administrator for Airports affirmed, concluding the Director's Determination is supported by a preponderance of reliable, probative, and substantial evidence, and is consistent with applicable law, precedent, and FAA policy. Final Agency Decision, *Air Transport Ass'n of America v. Port of Portland, Oregon*, FAA Docket No. 16-16-04 (May 15, 2018) ("*Final Agency Decision*").

## II.

The Association challenges the FAA's interpretation of the relevant statutes on the principal ground that the off-site stormwater charge and the Superfund charge are not operating costs of the Airport as defined in the statutory scheme because the drainage and cleanup services are provided outside the physical boundaries of the Airport. Although not disputing the principle that operating costs can include utility costs, the Association instead contests whether general expenses of running a utility specifically fall within the scope of operating costs. In its view, "operating costs of . . . the airport" as used in 49 U.S.C. §§ 47107(b) and 47133(a) must be "directly and substantially related to the air transportation of passengers or property" because that phrase also appears in the same statutory provisions. Further, even if the charges are operating costs of the Airport, the Association maintains the charges

must reflect the value of services provided to the Airport under 49 U.S.C. § 47107(k).

As a threshold matter, the Association maintains that the FAA's statutory interpretations are not entitled to deference by the court under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43 (1984), because the Associate Administrator's decision was the result of informal adjudication, rather than a formal adjudication or notice-and-comment rulemaking. *See* Pet'r's Br. at 30–31 (citing *United States v. Mead Corp.*, 533 U.S. 218, 226–27 (2001)). Even if so, under *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944), there can be little doubt that the FAA's interpretation of the congressional scheme has the "power to persuade," *Gonzales v. Oregon*, 546 U.S. 243, 256 (2006) (quoting *Skidmore*, 323 U.S. at 140).

Congress did not define "operating costs" and instead specifically left that determination to the FAA, which has embraced the commonsense conclusion that the general expenses of a utility are operating costs. 49 U.S.C. § 47107(k). The Revenue Use Policy excludes such "capital or operating costs," along with certain other "grandfathered" uses, from the definition of "unlawful revenue diversion." 64 Fed. Reg. at 7,716. The Policy clarifies that "[o]perating costs for an airport may be both direct and indirect," and may include costs consistent with the Generally Accepted Accounting Principles ("GAAP"). *Id.* at 7,718. The Compliance Manual is in accord, defining operating costs to include "utility costs" as well as indirect allocated costs for "utility infrastructure." FAA Order 5190.6B ¶ 18.9(a).

Because the FAA has decided that indirect utility costs are properly considered "operating costs," the allocated general expenses of running a utility are encompassed within the

"operating costs . . . of the [A]irport." The off-site stormwater charge and the Superfund charge are general expenses of running the water utility. The off-site stormwater charge covers the costs of stormwater drainage on public property throughout the City, which is the responsibility of the utility and benefits all City ratepayers. The Superfund charge covers cleanup and management costs that were incurred as a result of the utility's past operations. Both charges cover costs to fulfill the utility's responsibilities and allow the utility to continue providing services to all City ratepayers, including the Airport. Importantly, both of the challenged charges are calculated and applied uniformly among all ratepayers. The City uses a common cost allocation method, calculating the off-site stormwater charge based on a dollar amount multiplied by the square footage of impervious surface area on each ratepayer's property. The City calculates the Superfund charge based on the ratepayer's sewage volume and the impervious surface area on the ratepayer's property.

The Association does not contest the allocation method employed by the City. It also does not maintain that the two challenged charges assessed against the Airport are disproportionate. The use of a uniform cost allocation method guards against concerns that charges unfairly target an airport as a source of revenue for "other local programs that have nothing to do with aviation." H.R. REP. NO. 104-714, at 37 (1996). Hence, this is not a case in which the Association claims the airlines are being unfairly singled out. Rather, the Association's objections are based on a misreading and misinterpretation of the statutory scheme enacted by Congress.

Contrary to the Association's view that airport operating costs must be "substantially and directly related to air transportation of passengers or property," Pet'r's Br. 43–46 (quoting 49 U.S.C. § 47107(b)(1)(C)), the plain text of section

47107(b) and section 47133 provides that payments of capital or operating costs are permissible uses of airport revenue, rather than unlawful revenue diversion. Section 47107 sets off the airport's operating costs in subsection (1)(A). Each subsection is separated by semicolons, and the word "or" renders the list disjunctive. The phrase "substantially and directly related to air transportation of passengers or property" only modifies the other local facilities described in subsection (1)(C).

Looking to section 47107(k)(2), the Association maintains that all payments made by the Airport, including for operating costs, must reflect the "value of services and facilities provided to the airport." 49 U.S.C. § 47107(k)(2)(A). This overlooks that section 47107(k)(2) excepts the use of airport revenue "as authorized under subsection (b)." Thus, all payments authorized under subsection (b), including under (b)(1) for capital or operating costs and the grandfathered revenue diversions, plainly fall outside the scope of section 47107(k). Because the payment of capital or operating costs is not revenue diversion at all, payments of operating costs clearly cannot fall within the scope of section 47107(k)'s limitations on revenue diversion. The two challenged utility charges are airport operating costs under section 47107(b)(1), and so the limitations of section 47107(k)(2)(A) do not apply. The court therefore need not consider whether the two charges reflect the value of services provided to the Airport and the Association's related contentions.

In sum, the Association has offered no ground on which the court can conclude that, under the statutory scheme, the FAA failed to persuasively determine that the off-site stormwater charge and the Superfund charge for utility services provided within the City, as calculated and assessed uniformly based on a common cost allocation method, are properly

treated as the "operating costs . . . of the Airport" that may be paid using airport revenues.

## III.

The Association's challenges to the FAA's factual determinations and reasoning are unpersuasive. The court can overturn the FAA's decision only if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *City of Santa Monica v. FAA*, 631 F.3d 550, 554 (D.C. Cir. 2011). The FAA's factual findings are conclusive if supported by substantial evidence. 49 U.S.C. § 46110(c).

The Associate Administrator and the Director provided an adequate explanation of their reasoning. For example, the Director pointed out that when an airport is owned by a government entity, the Revenue Use Policy, 64 Fed. Reg. at 7,719, permits the government to allocate general government expenses and central service costs to the airport if the costs are allocated by a reasonable, transparent, and not unjustly discriminatory methodology. If indirect charges are permitted in those circumstances, the Director reasoned, no less should be true when an airport is independently owned. Thus, general expenses of running a utility must also be permissible as long as the expenses are allocated using a "reasonable, transparent, and not unjustly discriminatory" methodology. *Determination* at 13. The Associate Administrator agreed, finding that the charges are permissible because "there is ample evidence to support the argument that payment of the [charges] is necessary for the City to provide water and sewer services to the Airport," and the City "allocat[es] these costs to the ratepayers in a fair and transparent way." *Final Agency Decision* at 7–8.

The FAA did not, contrary to the Association's assertion, fail to consider the expert declarations presented by the

Association. Both the *Determination* and the *Final Agency Decision* make this clear. The FAA instead disagreed with the experts' statutory interpretations because they did not conform with the statutory text or FAA guidance. Because the experts proceeded on the unsubstantiated factual assumption that utility services are not provided to the Airport in exchange for the charges, the FAA properly gave their declarations little weight. The FAA's decision also is not, as the Association maintains, inconsistent with prior decisions finding incidents of unlawful airport revenue diversion at the Los Angeles International Airport and the Dade County Aviation Department in Miami, for neither of those involved uniformly allocated utility costs.

Because the FAA does not need to address whether the Airport received "value" under section 47107(k), we need not address the Association's remaining contentions.

### IV.

Finally, the Association's Anti-Head Tax contention that the challenged utility charges constitute impermissible taxes, because no services are provided to the Airport in exchange for the charges, fails.

The Anti-Head Tax Act, 49 U.S.C. § 40116(b), bars a State from collecting a tax or other charge on "(1) an individual traveling in air commerce; (2) the transportation of an individual traveling in air commerce; (3) the sale of air transportation; or (4) the gross receipts from that air commerce or transportation." The two challenged charges are imposed in exchange for the utility's services provided to the Airport. *Cf. Norfolk S. Ry. Co. v. City of Roanoke*, 916 F.3d 315, 319–22 (4th Cir. 2019). Thus, they are not on airline passengers or air

transportation in any form. The charges are imposed for use of water and sewage services, not for air transportation.

Accordingly, because the FAA properly defined the operating costs of an airport to include the general expenses of a utility, and the Port's payment of the off-site stormwater and Superfund charges therefore does not constitute impermissible revenue diversion, we deny the petition for review.